CLIFFORD MOOERS V. RICHARDSON PETROLEUM COMPANY.

No. A-1142. Decided July 16, 1947.
Rehearing overruled October 29, 1947.
(204 S. W., 2d Series, 606.)

*Warren Scarborough, Gillis A. Johnson, Ira Butler, Jack C. Wessler, Gillis A. Johnson, Cantey, Hanger, McMahon, Mc-Knight & Johnson,* of Fort Worth, *Carl Wright Johnson,* of San Antonio, *Black & Stayton,* and *Charles L. Back,* of Austin, for petitioner, Clifford Mooers.

*Lloyd & Lloyd,* of Alice, *Tarlton & Kosh,* of Corpus Christi, *Small, Arney & Small* and *C. C. Small,* of Austin, for respondent, Richardson Petroleum Company.

MR. JUSTICE HICKMAN delivered the opinion of the Court.

Shasta Drilling Company and James G. McCarrick formerly owned in equal parts oil and gas leases covering two tracts of land in Nueces County, one tract, known as the Erigan tract containing 10.46 acres, and the other, known as the Quiroz tract, containing a little more than 80 acres. On November 1, 1935, Shasta assigned its 1/2 interest in these leases to McCarrick and W. A. Richardson, in consideration of $30,000.00 to be paid out of 1/8 of 7/8 of the first oil produced from the leased premises.

Clifford Mooers, successor to all of the rights of Shasta Drilling Company, brought this suit against Richardson Petroleum Company, successor to all the rights acquired by McCarrick and Richardson under the assignment, and other parties for actual and exemplary damages on account of the illegal running of oil by Richardson Petroleum Company and its predecessor from the leased premises, for an accounting, for a termination of the Erigan lease and for a cancellation of the assignment by Shasta of a 1/2 interest in both leases. The First

National Bank of Chicago and the Republic Supply Company, original parties defendant, have been dismissed from the case by consent of the parties. In the trial before the court, without the assistance of a jury, judgment was rendered in favor of Mooers against Richardson Petroleum Company for $32,002.38 actual and $10,000.00 exemplary damages, but denying all other relief sought by him. The Court of Civil Appeals increased the amount of the actual damages from $32,002.38 to $91,320.21 and rendered judgment in favor of Mooers for that amount. In all other respects the trial court's judgment was affirmed. 201 S. W. (2d) 134. Each party filed an application for a writ of error and both applications were granted.

We consider first the contention of Richardson Petroleum Company that the Court of Civil Appeals erred in increasing the amount of the actual damages from $32,002.38 to $91,320.21. The relevant facts upon which this contention is based may be stated generally as follows: When the assignment of the 1/2 interest in the leases was made by Shasta to McCarrick and Richardson there was one well on the Erigan (Erigan No. 1) and one well on the Quiroz (Quiroz No. 2) each producing a small amount of oil. Quiroz No. 1 was a dry hole. The assignment required that the Erigan No. 1 and Quiroz No. 2 be reworked. This was done promptly with the result that Erigan No. 1 came in as a large producer and Quiroz No. 2 came in as a gas well. Just how much oil, if any, the Quiroz No. 2 produced along with the gas is not made clear by the record, but that fact is not material to the question now being considered. It is made clear that for many months Quiroz No. 2 did not produce its allowable as fixed by the Railroad Commission. W. A. Richardson, as head of the company, concealed that fact by running a secret underground pipe from Erigan No. 1 to Quiroz No. 2, through which oil was passed, and in that manner caused Quiroz No. 2 to produce its allowable. His company also owned other leases in the vicinity, notably the Harrell and the Sedwick leases, and secret underground pipes were run from Erigan No. 1 to those leases and the allowables of deficient wells thereon were made up from the production of Erigan No. 1. Later, after producing wells had been brought in on the Quiroz lease, oil was secretly run from those wells, and also from Erigan Nos. 2 and 3, for the same fraudulent purpose. This scheme was carried on over a total period of five years. During all of this time Mooers was the owner of 1/2 of the mineral estate in the Erigan tract, subject to the Richardson Petroleum Company's lease, and as such owner was entitled to receive 1/2 the royalty on all oil produced and saved

therefrom. He did not own any royalty in the Quiroz. He was paid his royalty on the reported production from the Erigan, but none at all on the oil produced from the Erigan and secretly piped to other leases. He sues in this case for damages, actual and exemplary, on that account.

█ The trial court made a general finding that the value of 1/16 of the oil illegally piped from the Erigan to other leases, based on the highest intermediary market value during such time, amounted to $32,002.38, and that said amount, together with $10,000.00 exemplary damages, would fully compensate petitioner for all damages sustained on that account. The Court of Civil Appeals on original hearing approved that conclusion and affirmed the case. On first motion for rehearing, it decided that "It is now impossible to unscramble the commingled mass caused entirely by the willful misconduct of the defendant and its predecessors," and the case was accordingly remanded with the instruction that it was a case calling for the application of the equitable rule of commingled assets. The trial court was instructed that, since Richardson Petroleum Company fraudulently commingled and confused the oil from the Erigan lease with oil from other leases and was unable to establish clearly and distinctly the amount of oil which was run from the Erigan lease, Mooers was entitled to recover his 1/16 royalty from all oil produced from wells connected by secret pipes with the Erigan lease during the entire period of the commingling.

We agree with those conclusions. The case is a proper one for the application of the commingling rule and the instructions of the Court of Civil Appeals correctly embody its elements. Eaton v. Husted, 141 Texas 349, 172 S. W. (2d) 493; Andrews v. Brown (Com. App.) 10 S. W. (2d) 707.

█ On second motion for rehearing the Court of Civil Appeals decided that the schedule furnished by Mooers, showing the reported production from the various wells to which secret pipes had been connected, enabled it to render judgment without the necessity of remanding the case to the trial court, and based upon that schedule it increased the amount of actual damages to $91,320.21, as stated above. In this we think that court fell into error.

The opinion itemizes the damages as follows:

(1) 1/16 of the value of the oil run to pipe lines from tanks connected to Quiroz No. 2, from December 1935 to September 1936.

(2) 1/16 value of oil run from tanks connected to Harrell No. 1 from March 1936 to January 1937.

(3) 1/16 value of oil run from tanks connected to all Sedwick low gravity wells from *April 1935* (1936?) to January 1937.

(4) 1/16 value of all oil from tanks connected to Harrell No. 1 from February 1937 to March 1941.

(5) 1/16 value of oil from tanks connected to Seedwick No. 7 from June 1938 to May 1939.

(6) 1/16 value of oil from tanks connected to all Sedwick low gravity oil wells from February 1937 to March 1941.

As to Item 3, the evidence is disputed. One witness testified that no oil was run to the Sedwick wells during 1936. Another witness testified that oil was run to those wells after June 1936, but he had no information prior to that date. Another witness testified that oil was run to those wells during the first three months of 1936, but had no information subsequent to that date. As to Item 4, one witness testified that no oil was run to Harrell No. 1 after July 1939. Another witness testified that it was run until at least August or September, 1940. We find no testimony at all that oil was run to that well after that latter date. As to Item 5, one witness testified to facts that would support the judgment of the Court of Civil Appeals, but another witness testified that the running of oil to the Sedwick No. 7 did not begin until February 1939. It is the province of the trial court to make findings of fact upon disputed evidence and the Court of Civil Appeals is not authorized to make such findings and render judgment based thereon.

■ In applying the commingling rule, it is proper to hold the willful commingler to a strict showing, but the rule has no application at all until the facts establish that there has been a commingling. If there was no commingling during a portion of the periods of time covered by Items 3, 4 and 5, then there is no warrant for the application of the rule to oil produced during such periods. Whether or not there was a commingling during those periods must be determined by the trier of facts. For this error the judgment of the Court of Civil Appeals must be reversed and the cause remanded to the trial court.

We approve the holding of the trial court, affirmed by the Court of Civil Appeals, that the remedy of termination or for-

feiture of the Erigan lease and cancellation of the assignment of Shasta's interest therein is not available to Mooers. The trial court found that under the facts Mooers never had a right to a termination or forfeiture of the lease, but that if such right originally existed, it could not now be asserted because he had elected to affirm his rights under the lease. The Court of Civil Appeals held that he never had the right to terminate or forfeit the lease, and did not discuss the question of whether, if such right ever existed, he waived it by affirming the contract with knowledge of the facts. We are well convinced that, if a right of termination or forfeiture ever existed in favor of Mooers, it has been waived, as held by the trial court, and under that view it becomes unnecessary for us to decide, and we do not decide, whether the right of termination or forfeiture ever came into existence.

On the question of waiver, it is disclosed that in the spring of 1941, Mooers became suspicious that the Erigan lease was being operated in a fraudulent manner and reported the matter to Federal agencies. After an investigation the agencies discovered and dug up most of the secret lines in the fall of 1941. An indictment was returned in the Federal court against certain officers of Richardson Petroleum Company on June 12, 1942. The indictment charged in the first count that W. A. Richardson had been running illegal oil from the Erigan lease. The remaining counts charged generally the running of illegal oil from leases owned by the Richardson Petroleum Company in the Saxet-Saxet Frio Field. The Erigan was one of the leases owned by the company in that field. The first count was dismissed and the officers who were indicted pleaded guilty to the remaining counts, on August 26, 1942. Mooers read of the Federal proceedings in a newspaper. On June 4, 1942, this suit was instituted by Mooers in the District Court of Midland County. A plea of privilege was sustained on June 20, 1942, and the record was subsequently filed on July 16, 1943, in Nueces County. On May 11, 1944, Mooers filed an amended petition in which, for the first time, he sought termination of the Erigan lease. He first gave notice of his intention to terminate it in the summer of 1943. In his original petition, in which he sought the recovery of damages, he alleged ownership in himself of a 1/2 interest in the minerals on the Erigan tract subject to the oil and gas lease owned by Richardson Petroleum Company. It was alleged that "* * * the defendant has not accounted for the oil or the proceeds thereof in full but has fraudulently concealed the correct amount of the oil produced from said premises for the account of the plaintiff and has caused to be rendered false

and fraudulent statements thereof and has appropriated to its own use and benefit large amounts of the plaintiff's oil and the proceeds thereof in excess of the oil accounted for to the plaintiff in an amount largely in excess of the sum of $5,000.00, but the true amount thereof is known only to the defendant and its agents and servants, and the information thereof is being withheld from the plaintiff for the fraudulent purpose of depriving the plaintiff thereof. * * *"

The prayer was for judgment for damages and a foreclosure of a lien on the leasehold estate. A notice lis pendens was filed making known that Mooers was claiming such lien. During all the relevant time, and up to the date of trial, Mooers regularly accepted checks in payment of his 1/2 royalty under the lease.

■■ The cause of action asserted by Mooers in his original petition for damages is based upon the fraud of Richardson Petroleum Company in producing more oil than was accounted for and in that way appropriating royalty belonging to Mooers to its own use. That is, in effect, the same ground relied upon in his amended petition wherein he sought forfeiture of the lease. If the fraudulent operation of the lease was a ground for terminating it, then when this suit was filed Mooers had sufficient knowledge to put him to an election whether to affirm the lease and sue for damages or repudiate it and sue for a termination. He chose the former course and filed a notice lis pendens that he claimed a lien on the lease. Not only so, but he continued to the time of the trial to accept royalty payments under the lease, These acts on his part were inconsistent with an intention to terminate the lease and constitute an affirmance thereof and a waiver of any right to forfeiture, if in fact he ever had such right. Seamans Oil Co. v. Guy, 114 Texas 42; 262 S. W. 473; 115 Texas 93; 276 S. W. 424; Rosenbaum v. Texas Building and Mortgage Co. 140 Texas 325, 167 S. W. (2d) 506; Minter v. Hawkins, 117 S. W. 172 (error refused) ; Chapman v. Guaranty State Bank, 297 S. W. 545 (error refunded).

■ The assignment of the 1/2 interest in the leases from Shasta to McCarrick and Richardson contained an express provision for forfeiture of the Quiroz leasehold estate assigned therein as to which no waiver has been shown. That provision is as follows:

"If production from the Quiroz No. 2 well ceases for a period of thirty (30) days, and assignees, their heirs, executors, administrators or assigns, are not actively engaged in drilling a

well or wells on said lease, or are not actively engaged in re-working the Quiroz No. 2 well, then in that event the under-signed shall at its option, have the right to forfeit the Quiroz leasehold estate herein granted, and upon a declaration in writing of such forfeiture, the Quiroz leasehold estate herein assigned, shall, ipso facto, revert to and become vested in the undersigned."

It is the position of Mooers that that estate has reverted to and become vested in him under that express provision. We cannot adopt this view. An issue of fact was raised in the evidence as to whether or not the conditions giving rise to the right of forfeiture under that provision ever came into existence. But even if it had been established that at one time Mooers had that right, it is our view that he was not entitled to exercise it at the time he first sought to do so, after the property had been developed and rights of third parties had attached. Mooers owned no royalty under the Quiroz lease. The consideration for the assignment of his interest in that lease and in the Erigan lease was $30,000.00 to be paid out of 1/8 of 7/8 of the oil. That payment was completed early in 1937 and a release duly executed of all interest which Mooers had in those leases. Mooer's primary interest in the Quiroz lease was the collection of the $30,-000.00. When that was paid he had no interest in that lease which would support an action for forfeiture. But it does not follow that he was without remedy for the fraud. If, prior to that time, there had been a complete cessation of production and drilling for a period of thirty days, so as to give rise to a right of forfeiture under the express terms of the assignment, and that fact had been concealed from Mooers by the fraud of the operators, then, upon his discovery of the fraud, his remedy was an action for damages for the value of that right which he had lost as of the date it was lost.

The judgments of the courts below are both reversed and the cause remanded to the trial court for another trial in accordance with this opinion.

Opinion delivered July 16, 1947.

Rehearing overruled October 29, 1947.